Sullivan, no relation, v. UBS et al. Alright, Mr. Citron, good morning. You have reserved four minutes for rebuttal, so that gives you eight minutes to start. May it please the court, because there are at this point a lot of arguments being made in this case, and it's been a long morning, I thought it might be helpful to start with just a tiny bit of table setting. You can think about the claims in this case as dividing into two basic families. On the one hand, you have over-the-counter, or OTC, transactions, which are bespoke financial transactions directly between defendant banks and plaintiff class members. That's your swaps, FX forwards, and forward rate agreements. And on the other hand, you have futures contracts, which differ because they are traded over exchanges, they're standardized contracts, traded over exchanges like the Chicago Mercantile Exchange. And there, because of the clearinghouse function of the exchange, you don't know who's on the other side of the contract. So even though the defendants had huge futures positions, and the plaintiffs did too, you can't tell with respect to any given purchase who the real counterparty is on the other side. And unless the court would like me to start somewhere else, I'd like to start with the OTC contracts, because there I think it's most obvious that given what the district court has already held and the way that the law has changed since the decision below, that a reversal in remand is going to be necessary. So with respect to these OTC transactions, those are antitrust claims. The district court ruled in our favor in every respect except for personal jurisdiction. And the personal jurisdiction issue with respect to the OTC claims has been resolved by several intervening decisions of this court, including Schwab 1, Schwab 2, Platinum and Palladium, and most recently the Mexican Bonds case. And there's a couple of different ways you could get to personal jurisdiction, but I think the easiest way for the court to rule, because it would cover everybody involved, is on the basis of the conspiracy theory that's articulated in Schwab 1 and Schwab 2. There, what we have to show is that one of the defendants, right, the theory there is that if one co-conspirator did an over, if one co-conspirator acted in the United States in furtherance of the conspiracy, then that on an agency theory allows for personal jurisdiction over the whole conspiracy. And on that you're mainly relying on those weekly calls at Deutsche Bank, which took place I think in New York, or if there were participants in New York. I think they were organized from New York, but really what we're relying on is Deutsche Bank just admitting to the New York state regulator that it used its New York branch in executing on its scheme to manipulate Eryibor. The defendants have no response to that admission other than to cite a 50-year-old decision in Lipsky. Well, they said they either manipulated or attempted to manipulate that consent decree. Yes, but that would still be an act in. Or attempted. But the attempt is an act in furtherance of the conspiracy, right? It suggests, it subjects them to personal jurisdiction, which is all we're debating here at this moment. Could you, maybe now we're just in the course of discussion, personal jurisdiction, could you discuss whether there's any meaningful distinction between the bank defendants and the, say, the ICAP defendants? Yeah, sure. So the reason I said it would be easiest to rule on the basis of conspiracy jurisdiction is that there's an even more obvious basis for personal jurisdiction with respect to the bank defendants, but it doesn't apply to ICAP. And that's that the defendants, because these are the bespoke, over-the-counter, direct transactions, the bank defendants are being asked to respond to claims related to contracts that they sold into the United States. And that clearly creates personal jurisdiction with respect to those claims. That's the less controversial holding in Schwab 1 that was recently clarified in the Mexican bonds case. If you're selling the product into the United States, you're very unsurprisingly subject to the personal jurisdiction of the U.S. courts with respect to those contracts. So that applies to the bank defendants, but ICAP is a broker, it's not a bank, and we don't have allegations that ICAP was brokering transactions in the United States with respect to those contracts. So for ICAP, you would have to rely on the conspiracy jurisdiction. And that would create a difference, but I don't think it's a meaningful difference. You're saying you could rely for conspiracy for both, right? Yes, right, exactly. So unless there are other questions about personal jurisdiction. Well, I was kind of curious if you could point to the allegations with respect to ICAP and the conspiracy, because I think arguably the allegations are stronger with respect to the banks that reported conspiracy than with respect to the ICAP folks. But maybe they're not. Tell me why. No, I'll give you arguably stronger with respect to the banks, but I think it's only because given that it's the pleading stage, we have an extraordinary amount of evidence about the banks. We have less about ICAP, and that's because ICAP is not as direct a participant in the conspiracy and isn't necessarily communicating in the same ways. But the allegations, principal allegations that are relevant, you'll find on JA 2550 through 51, 52, and beginning with paragraph 195. And what I think are the most important here is you have more Yousef and Batar talking about a scheme to manipulate Uribor in common, and what one of them says is tell ICAP to move to six months. And that is not evidence of ICAP participating in the conspiracy for purposes of proof beyond a reasonable doubt, but it certainly is circumstantial evidence. What does that mean? But I guess that's the thing. That seems like a slender read. Just talk me through that allegation. Sure. So elsewhere in the complaint, there is a description of how brokers were used in connection with these conspiracies, and that's as a go-between to exchange information between the banks when they want to have movement. And you can understand why they would use a broker. You know, with respect to Batar and more Yousef, these are old friends. They know that you're not going to take their Bloomberg chat and forward it to your compliance officer. But that's not true with respect to everybody who gets pulled into the conspiracy. Brokers are able to be more effective go-betweens, and the brokers also help to spoof the cash market, right? They'll try to broker a transaction for actual deposits that is in the direction you want to move Uribor. And so more Yousef, Batar, and other banks, they would use the brokers to communicate information. Actually, there's a really useful description in the FSA's findings with respect to UBS of how this worked. They're talking about manipulating Libor and Uribor. This is on JA 945 and 946. It starts, I'm sorry this is a little bit long, but UBS's breaches were extremely serious. They took place over nearly six years across a number of Libor currencies and Uribor. There was a culture where the manipulation of the Libor and Uribor sending process was pervasive. The manipulation was conducted openly and was considered to be a normal and acceptable business practice by a large pool of individuals. Then paragraph 185, UBS's misconduct extended beyond UBS's own internal submission process to sustained and repeated attempts to influence the submissions of other banks, acting in collusion with panel banks and brokers at a number of different broker firms. Some UBS employees colluded with brokers in serious market misconduct, such as making false bids and offers in the cash market and disseminating false suggestions of appropriate Libor rates to panel banks and other market participants. So it's that rule, which is here. But that doesn't mention ICAP. It doesn't mention ICAP. It just says brokers. Absolutely right. Lower case letter. Who knows who. Absolutely right. And it's that allegation of the conversation of 2550 to 51 that you suggest ties that general allegation of, hey, there's some misconduct that involved brokers to them saying they're going to ask ICAP, I guess, to raise six months. That's right. You had asked what the role of the brokers in the conspiracy was. Right. So I was trying to. So that's what the regulator's talking about. 2550, if I've got that, that's where you would argue that the link is made to these particular defendants. Right. You have the kingpins saying use ICAP to achieve what they're trying to achieve. There's also on the next page, there's a description of a dinner that I think it's where Yousef attends with ICAP. And he says that he went to dinner with ICAP and they discussed requests that Citi was making to move the Euribor rate as well. So that indicates that ICAP is participating by receiving requests. That was Euribor rate? Or I thought it was a different rate, the Eonia rate or something. Yes, but those are going to be intimately related. But they're different. They are different. They are different. But they're both Euro rates. But, again, so you're asking for an inference. I guess you're arguing it's a slight inference, but the inference that they're talking about rate A, they're also talking about rate B? Yes, although here we're talking about, I guess I would say, rate A and rate A prime. But I think that's right. What we are asking is, with respect to ICAP in particular, what we're asking is for fair inferences from the materials that we have, which are limited. We only have Barclays ACPERA cooperation materials. And whatever the governments have released publicly in connection with the settlement agreements, that's obviously not the universe of information. We've had no discovery from ICAP. We certainly might find more if we were entitled to even take a deposition with respect to ICAP. And like I said, we're asking for fair inferences with respect to ICAP. I think, as I mentioned earlier, the evidence is much stronger with respect to all of the bank defendants. So, I mean, we're still on personal jurisdiction and we're in conspiracy theory at this point. I mean, and we're already over time. So what are the other key points you want to hit here? We've read the briefs. Yeah, yeah. So the only other thing I would emphasize is, with respect to the futures contracts, which I mentioned at the beginning, there's a few different issues there. But there's also two different kinds of claims. There are antitrust claims and CEA claims. I think the antitrust claims are the more important ones at present. And there, all the district court held was that we didn't have antitrust standing with respect to the futures contracts because we don't know that we're in privity with the defendants. And in Platinum and Palladium, this court recently explained that traders in the futures market can have antitrust standing when the defendants are using the futures market to profit on their scheme. And that's unambiguously true here. There's chats where Mo Yusef is talking about how large his position is in futures contracts on the CME. And there's a trader who says, you know, who is getting screwed by that. He uses slightly more colorful language. But, you know, it's the street on the other side of the transaction. And so the defendants are using the futures market to profit. That means that, you know, the defendants and the plaintiffs are in the same market. They're taking in money. We're the victims. That's an appropriate basis for antitrust standing. And again, that's also a decision the district court did not have at the time that it ruled. And I think if you can clean up those two issues, we'll have, that would be the most material for us with respect to these claims and going back to the district court. Any other questions? I can talk about the CEA claims if you'd like. Well, there's a lot of different things that are in the briefs. So I guess, I mean, obviously, any time you have an argument like this, you've got to pick your battles. So you pick the ones that you think you want to focus on. Yes. I mean, if there's stuff with respect to the cross appeal, I can address it. Okay. So let's then hear, we're going to hear from Mr. Mazina. Yes. Good morning, Your Honors. Ms. Brandt will be addressing the issue specific to ICAP, and I'll be addressing everything else. Okay. And just to remind me the time that you've divided among you. I have 10 minutes, and Ms. Brandt has two. Okay. All right. Go ahead. Thank you, Your Honor. So I'd like to start where Mr. Citron started and spent most of his time on conspiracy jurisdiction. And here, I think the central problem that cuts across both jurisdiction and the merits is that there is really nothing in this complaint that connects these four remaining defendants to the extremely broad conspiracy the plaintiffs tried to allege. And I appreciate this is a big, hefty complaint. It's hefty because it has a lot of allegations about the many defendants that settled out of this case. If you focus on, and as I said, Ms. Brandt will talk about ICAP. I want to talk about the three banks that are left, UBS, RBS, and Rabobank. The allegations that are intended to tie those defendants to the conspiracy are essentially in just six paragraphs of the complaint. It's paragraphs 158 to 163. For UBS, the complaint does not allege any inter-firm communications related to Uribor. Not at all. For Rabobank, the only communications that are alleged are between Rabobank and a third-party bank that's not alleged to have been a member of the conspiracy and is not a member of the Uribor panel. Now, the CFTC, in its settlement order that plaintiffs attached to the complaint at page 1246 of the JA, specifically says the communication between Rabobank and that other bank are not part of the same collusive conduct that the CFTC found with respect to Barclays and some of the other panel banks. So the CFTC itself is saying that's not the same conspiracy. Finally, for RBS, the complaint cites only one inter-firm communication regarding Uribor. It's an October 2007 chat with Barclays. It's in paragraph 158 of the complaint. There's nothing to tie that one communication to any larger conspiracy involving any other banks or any other period of time. Not only that, but the allegations in the complaint make clear that the relationship was not a conspiracy. It was actually a rivalry. There are multiple communications cited in the complaint where the conspirators are complaining about these defendants not being on board with the conspiracy. So if you look, for example, paragraphs 161. Well, the fact that not everybody is sort of playing right in the conspiracy doesn't make it a rivalry, does it? Your Honor, let me quote from page 1417 of the joint appendix. The conspirators say we have to fight hard against RBS because they're an opponent to be reckoned with. Paragraphs 161, 163, 204 of the complaint also show the conspirators saying RBS and UBS are against us. They're pushing Uribor in the opposite of the direction we want it to go. I think plaintiffs want to suggest that the fact that the conspirators could guess what RBS and UBS were doing means there must have been some sort of collusion there. But the complaint shows just the opposite. In the chat, the conspirators explain the reason they know that is they have trading positions against RBS and UBS. So they know that RBS and UBS have the opposite interest to what the conspiracy has. So, you know, I think this Court's decision in Treasuries from a few months ago really highlights this. The Court said there even if it might be reasonable to think that the conspiracy might have extended beyond the specific defendants participating in the chats, plaintiffs still have to do some reason to believe that the defendants named in the suit were involved. And that's just not here. I think that's fatal to the conspiracy theory of jurisdiction. Just briefly on the issue of overt acts. If you'll make a moment to – a conspiracy of jurisdiction. If Deutsche Bank is involved in the conspiracy and it takes overt acts in the United States, that would reach all of the other European banks if they are involved in the conspiracy. And I understand you're saying that they are not. There's no evidence of it. These weekly risk calls don't seem to mean to me very much. But your adversary points out that there's a – you know, there's a consent order. And Deutsche Bank says that they manipulated or attempted to manipulate various benchmarks, including Eurobor. Judge Jacobs, I think, as Mr. Citron suggested, that consent order is the main thing that they have to rely on for an overt act in furtherance of the conspiracy. And I think they are stretching that consent order too far. The quote that Your Honor is referring to comes from a preparatory whereas clause at the beginning of the agreement that just lumps together all of the defendants, the different Deutsche Bank entities, and lumps together all of the currencies at issue and says these entities manipulated these currencies. When you actually go into the consent order, there are – it's a long order. There's a lot of specific facts about what happened with each currency. The section that's about Eurobor does not mention anything that happened in the United States. It's all about people in Europe, primarily the London money markets desk. So I just think it puts too much on that one preparatory whereas clause, particularly when personal jurisdiction is about fairness to these defendants. Deutsche Bank had no reason to fly spec that whereas clause. The actual factual allegations and admissions in the consent order do not suggest any acts in the United States. Turning to plaintiff's alternative theory of jurisdiction based on transactions, I want to be clear. I think that theory is wrong, but I also think I want to emphasize what would follow if the court said the conspiracy is not pleaded, but there's personal jurisdiction for direct over-the-counter transactions,  First of all, Rabobank and ICAP would be out because there's no allegation that either of those defendants entered into any transactions with any plaintiffs. Second, the antitrust claims would fail because they depend on the conspiracy. There would be no personal jurisdiction for the CEA claims because those claims don't arise out of direct transactions. And the RICO claims – the RICO enterprise alleged in the complaint was this very broad 12-bank, six-year conspiracy. Without that conspiracy, plaintiffs have never tried to allege that these defendants were operating as RICO enterprises in some narrow way. So that would just leave the state law claims, and I think the district would probably decline supplemental jurisdiction over those. But – I'm sorry. Can I just get back to – I mean, the conspiracy claim. I mean, I'm looking at the complaint. I mean, they basically rely on statements from Buraseth and others that are basically talking about RBS and UBS doing things – basically doing things in tandem, and the information itself shouldn't – it shouldn't have been shared. So the mere fact that there's knowledge of what they're doing before they're doing it supports an inference of a conspiracy, doesn't it? No, not at all, Judge Sullivan. I'm looking at 161, and I mean, it's – what am I missing? So I think if you look at Paragraph 1 – I guess it's Paragraph 161. So this is the put-it-to-sky paragraph. If you look at that chat, the person who's talking – I forget if it's Mr. Mouyousef or Mr. Esper, but they explain why they know what RBS and UBS or what they think RBS and UBS are going to do. It's because they have positions against those banks. So what he's saying is I'm on the opposite side of a derivative transaction with RBS and UBS, so I know that their self-interested motive is to put it to the sky when I want it to go in the opposite direction. That's why I said it's a rivalry, not a conspiracy. And there's no inference there that there's any kind of collusion. He's inferring their motives from the positions he has against them. That's why he can say what he thinks they're going to do. Turning back to the issue of jurisdiction over the individual transactions, I think this court in the Mexican bonds case, Santander from a few months ago, said something that was pretty clarifying on this issue. What the court said is when you have a claim that misconduct took place abroad but there were sales in the forum, those in-forum sales create personal jurisdiction if the foreign misconduct was baked into the product itself that was sold in the forum. That's what the court said. And that's true. That was true of the price-fixed bonds there. It was true of the defective cars in Ford. But the court distinguished that from foreign manipulation of a benchmark like in Schwab that's then incorporated by reference in the product. And the court said in that situation the court needs to police the line between the alleged wrongdoing and the sales much more carefully. And here there's no allegation that connects the misconduct alleged in Europe to any transaction with any party in the United States. So let me turn briefly in the little time I have left to a couple of the merits issues. I think Layden is clearly controlling on extraterritoriality and provides an independent basis to dismiss the CEA claims and the RICO claims. The domestic conduct that was alleged in Layden was essentially the same as what's alleged here. Plaintiffs haven't really offered any basis to distinguish Layden. And finally, as to the instruments, FX forwards and CME futures that don't incorporate URIBOR as a price term, and plaintiffs acknowledge at page 14 of their brief that there is no literal URIBOR term in these contracts, I think antitrust standing as to those is clearly foreclosed by this court's decision in Schwab 2. This is exactly like the short-term fixed-rate bonds in that case where plaintiffs said they don't have a LIBOR term, but everyone in the industry considers LIBOR when pricing them. They're making the same allegation here, and this court said that was clearly insufficient for antitrust standing. Your Honor, my light is on, but I'm happy to answer any more questions the court has. No, okay. We'll hear from Ms. Brandt. Thank you. May it please the court, my name is Sherry Brandt. I'm with Perkins Coie. I'm representing ICAP PLC and ICAP Europe Limited. We agree with the arguments from our colleague, Mr. Mazzina, and I'm here to address ICAP as defendants because they are very different from the banks in four ways, some of which have already been discussed. They're not a bank. They didn't make submissions to the URIBOR panel. They did not trade or broker anything with plaintiffs, with any retail customer, or with anyone in the U.S., and I think Mr. Citron has acknowledged that. And they don't have it. This is important. They don't have any regulatory or government settlements or admissions relating to URIBOR. Mr. Citron mentioned UBS FSA findings. They don't mention ICAP in them. It talks about unnamed interdealer brokers. And then when you get to the complaint, which is the fourth difference, there are only, I was going to say four paragraphs, but it's really two paragraphs that specifically try to tag and shoehorn ICAP into this conspiracy. Mr. Citron discussed both of them. One of them has brackets around ICAP, so we don't know if it actually mentions them in the actual communication, but what it says is tell ICAP to raise six months. What paragraph are you referring to? I'm referring to paragraph 195 in the complaint. It doesn't say whether that relates to URIBOR. It doesn't say if the trader spoke to ICAP. It doesn't say if ICAP did anything. It doesn't say if it impacted anything. The only other paragraph that purports to mention ICAP is the dinner conversation that came up. That's paragraph 198 in the complaint. It recounts a dinner at which a trader at a different bank. I guess what is in the brackets? I don't know what's in the brackets. It says ICAP in brackets, which means they added it. I don't know what it said originally, and I don't know on what basis they added ICAP. But assuming it did say ICAP originally, it still doesn't tell us anything about the communication. The only other communication that's quoted is in paragraph 198. It has to do with a dinner where a trader at a different bank asked for a quote relating to EONIA, and the broker provided it. Again, that says nothing about manipulation, nothing about URIBOR, nothing about conduct. And I heard Mr. Citron ask for fair inferences. I'm not sure what test or case that comes out of, because I'm looking at the Twombly case, which requires alleging enough factual matter to suggest an agreement was made. I'm looking at Schwab, which says the plaintiffs are required to plausibly allege knowing involvement in the conspiracy. You don't think Iqbal and Twombly allow for fair inferences? I don't think they allow to take an ICAP. And by the way, we found two communications. That may not be a fair inference, but you seem to be making a legal point that fair inferences are a bridge too far under Iqbal and Twombly. That strikes me as hard to argue. I would say the inference is a highway and a bridge too far in this case. There's just simply nothing alleged against ICAP. They were added late in the day in the complaint, in the fourth amended complaint. The best that they came up with in the allegations are these two paragraphs. And although conspiracy jurisdiction legal standards have evolved since the motion to dismiss was granted, none of the standards would allow the lack of allegations here to find that ICAP was a plausible knowing member of a conspiracy and committed some overt act in furtherance of it. And that applies both for the personal jurisdiction decision, which was granted in our favor, and also the antitrust claim, which we say was erroneously sustained against us. That's our cross appeal. And we would say that the findings from the personal jurisdiction decision, which Judge Costell said he reviewed were limited as to ICAP and did not reflect any conduct as to ICAP, we would say those findings also compelled a dismissal of the antitrust conspiracy claim against us, which is the only claim that otherwise would be left. And I'll pause there if there are any further questions for me. No. Look, I think we're all focused on the parts of the complaint that relate to ICAP. So I guess I'm going to ask Mr. Citron to interpret paragraphs 195 and 198. Okay. Thank you. Thank you very much, Ms. Grant. All right, Mr. Citron, you're back up. That's right. So maybe we start right there. I mean, what paragraph 195 says, basically the Barclays Eurobar trader, I never had to pronounce it, Marusef. I think it's Marusef, but I'm not sure. Deutsche Bank's Eurobar trader, Bittar, to have ICAP help them raise 6 million Eurobar by disseminating false bids and offers. And that's your description of what follows. And it's not clear to me that that's what it says at all. It just says, tell ICAP to raise the 6 million. 6M, it's six month. Six month, yeah. It's all this code. It's all this jargony shorthand. What is there that suggests that these are disseminating false bids? There is only the information that we know about what Marusef and Bittar were up to. Look, you've got a conclusory statement that I just read in 195. And then you say that's your description of what happens in just a two-person exchange. And I'm not sure, what is your basis for saying that this is a request to have ICAP help disseminate false bids? Well, the only thing ICAP could do to raise the six month would be to communicate to other banks that Bittar and Marusef want higher cash prices in order to raise the six month Eurobar. To be clear, I mean, I agree that there is less evidence with respect to ICAP. And what's going on here is that we know from the settlements that brokers were involved. But the governments have not revealed which brokers are involved. The ACPERA stuff that we have from Barclays suggests that ICAP is one of the brokers because they're mentioned in these collusive communications between Marusef and— —knowing involvement in a conspiracy to fix the rate. As I said, the other thing is the dinner where they seem to be aware of requests from Citibank. It is about EONIA. I do think that we are talking about—this is what Twombly is about, right? We know there is a conspiracy. We know that brokers are involved. And we know that the people who are engaged in literal, transcripted antitrust crimes are talking about ICAP. And the question is, is it a fair inference, one that establishes that it's plausible that ICAP participated? Or is that a bridge and a highway too far, I guess? And I accept that we are in a debatable area with respect to ICAP, but I think not with respect to everybody else. I just want to make one point to show how much distance there is between what the banks are saying and reality. They say that we only rely on RBS participating in one communication or something like that. The European Commission found that RBS was part of something it described as, quote, the euro-based interest rate derivatives cartel. And RBS is up here telling you that there is no evidence or inference from the complaint that RBS participated in any such conspiracy. Moryousef, who is the kingpin, moves to RBS in 2007, and then he keeps doing what he's doing. That's what paragraph 158 of the complaint is about. And, you know, I think we are at the point where the banks are really trying to escape liability for something that is all but proven at the complaint stage, as opposed to just, you know, fair inferences for purposes of Twombly. The only other thing I want to point out, this is something that Judge Sullivan mentioned. You know, they say that there isn't evidence that these are rivals or something like that. Cheating in cartels is totally normal. Incentives are not always aligned. In a bid-rigging situation, classic bid-rigging situation, I've got to let you win this one because I want your help on the next one. We're not alleging that for every single transaction, every single bank always had the same incentives. What we're alleging is that they formed a trusted group of traders at the banks who were willing to scratch each other's backs when they needed it in exchange for that down the line. And the best evidence of that, you can see another expressly transcribed example of this is at paragraph 157 of the complaint, where Moryousef is recruiting someone at Credit Agricole into the conspiracy. He says, do you ever ask your treasury to move the rates around for you? And the reply is, it's possible, this is in all caps, it's possible, but what's in it for me? And Moryousef promises, whatever you want, the right to ask me for fixings wherever you want, whenever you need them. That's the conspiracy we're alleging. There is an enormous amount of evidence that it existed. If there are other questions. Well, thank you very much. We may see you again. So we'll reserve decision on this one.